# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: March 11, 2020

Ms. Ebony L. Duff
Ms. Lauren Ann Saad
Garan Lucow Miller
1155 Brewery Park Boulevard, Suite 200
Detroit, MI 48207

Mr. Brian J. Farrar
Mr. Raymond J. Sterling
33 Bloomfield Hills Parkway, Suite 250
Bloomfield Hills, MI 48304

Re: Case No. 19-1763, *Dennis Willard v. Huntington Ford, Inc.*
Originating Case No. : 2:17-cv-14202

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0080p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

DENNIS J. WILLARD,

      *Plaintiff-Appellant*,

   *v.*

HUNTINGTON FORD, INC.,

      *Defendant-Appellee.*

> No. 19-1763

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-14202—Arthur J. Tarnow, District Judge.

Decided and Filed: March 11, 2020

Before: MOORE, KETHLEDGE, and BUSH, Circuit Judges.

───────────────

#### COUNSEL

**ON BRIEF:** Raymond J. Sterling, Brian J. Farrar, STERLING ATTORNEYS AT LAW, P.C., Bloomfield Hills, Michigan, for Appellant. Lauren A. Saad, GARAN LUCOW MILLER, P.C., Detroit, Michigan, for Appellee.

───────────────

#### OPINION

───────────────

  KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Dennis J. Willard appeals the district court's grant of Defendant-Appellee Huntington Ford, Inc.'s motion for summary judgment on his age-discrimination claims brought under the Age Discrimination in Employment Act of 1967 and Michigan's Elliott-Larsen Civil Rights Act of 1976. Willard claims that Huntington Ford terminated him because of his age after it fabricated a superficially

legitimate reason to terminate him based on an incident between him and another coworker. The district court failed to view the record in the light most favorable to Willard, leading it to conclude erroneously that he did not offer indirect evidence of age discrimination. Therefore, we **REVERSE** the district court's judgment and **REMAND** for proceedings consistent with this opinion.

# I. BACKGROUND[1]

Dennis Willard is a successful, veteran car salesperson. Since 1997, he has worked in automobile sales. R. 16-2 (Willard Dep. at 41) (Page ID #108). Willard spent about half of his career, from February 2005 to December 2016, at Huntington Ford. *Id.* at 32, 49 (Page ID #106, 110). Although his performance during his tenure at Huntington Ford was average in some respects, such as automobile-lease retention, he was known as an excellent deal closer with new customers. R. 16-6 (Scoggin Dep. at 28) (Page ID #150); R 16-11 (Schiller Dep. at 58) (Page ID #240) ("Great closer. Determined."). For this reason, Willard was one of Huntington Ford's top salespersons. R. 16-6 (Scoggin Dep. at 28) (Page ID #150). Nationally, he performed within the top 125 of 3,500 Ford Motor Company salespeople. R. 16-2 (Willard Dep. at 134) (Page ID #132). He received prestigious awards from the Ford Motor Company and Huntington Ford in recognition of his sales volume. *Id.* at 79 (Page ID #118); R. 16-11 (Schiller Dep. at 112–13) (Page ID #253–54). Willard's commission-based salary demonstrated his skill—while some of his colleagues were earning roughly $40,000 annually, he was hitting $150,000. R. 16-2 (Willard Dep. at 70) (Page ID #116); R. 16-16 (Employment Application at 2) (Page ID #263); R. 16-11 (Schiller Dep. at 26–27) (Page ID #232) (stating that car salespersons' salaries were based on commission).

Willard's success won him one of the most visible, and hence desirable, desks in the dealership's showroom, near the door where customers entered. *See* R. 16-11 (Schiller Dep. at 43, 76) (Page ID #236, 244); R. 16-7 (Malouf Dep. at 28) (Page ID #180). Willard took full advantage of his location; he had no trouble walking up to customers as they came through the

---

[1]We present the facts in the light most favorable to Willard as we must on Huntington Ford's summary-judgment motion. *See infra*, Part II.

door.  R. 16-7 (Malouf Dep. at 23) (Page ID #179); R. 16-8 (Calhoun Dep. at 33) (Page ID #203).  Nor was he bashful about pushing his customers' paperwork through with Huntington Ford's support staff and insisting that his customers took top priority.  R. 16-6 (Scoggin Dep. at 38) (Page ID #153); R. 16-11 (Schiller Dep. at 59–60) (Page ID #240).

This created a reputation for Willard as both a focused, aggressive salesperson, *see* R. 16-7 (Malouf Dep. at 23) (Page ID #179), and an "abrasive" "bully," R. 16-6 (Scoggin Dep. at 12) (Page ID #146).  But dealership showroom floors are not tranquil or slow-moving; they are anxiety-provoking and intense work environments that lend themselves to interpersonal friction, even raised voices.  *See id.* at 36 (Page ID #152) ("I think sometimes in the showroom floor . . . the intensity amps up a little bit. . . . You know, when we get busy, I think sometimes the anxiety level gets a little high."); *id.* at 37 (Page ID #153) ("Q:  Okay.  Have you ever seen [co-worker Kim Duley] raise her voice at any coworkers?  A:  I'm sure she has . . . [like] the vast majority of the other people here.  It gets busy.").

Despite his professional accomplishments, Willard faced "relentless" unwelcome and inappropriate statements at Huntington Ford about his age and the imminence of his retirement from Brad Schiller, the general manager, and from Willard's direct supervisors, sales managers Eric Calhoun and Tony Malouf.  R. 16-2 (Willard Dep. at 89, 141) (Page ID #120, 133).[2] Willard was born in 1953, making him about sixty-three at the time of his termination.  *See id.* at 13 (Page ID #101).  Willard was also the oldest full-time new-car salesperson at Huntington Ford.  *See* Sealed Ex. N, Jan. 2016 Employee Census at 1–3.[3]

The ageist statements began when Schiller started to ask Willard when he was going to retire.  R. 16-2 (Willard Dep. at 135–36) (Page ID #132).  Willard informed Schiller that he did not intend to retire "anytime soon."  *Id.*  Malouf and Calhoun also began asking Willard when he would retire and used ageist insults against Willard, including "grandpa," "dinosaur," and "over the hill."  *Id.* at 136, 138, 146–47 (Page ID #132–33, 135).  Calhoun favored younger

---

[2]Schiller supervised Calhoun and Malouf.  R. 16-11 (Schiller Dep. at 9–11) (Page ID #228).

[3]Only the sole part-time new-car salesperson was older than Willard; he was seventy-four.  *See id.*; R. 16-11 (Schiller Dep. at 17) (Page ID #230).

salespeople, expediting their paperwork over Willard's. *Id.* at 88–89, 146–47 (Page ID #120, 135). When Willard complained, Calhoun told Willard that if he did not like the way things were, then he could leave, but that Calhoun did not "know too many people looking for a sixty-five-year-old over-the-hill salesman like you." *Id.* at 89 (Page ID #120). Malouf told Willard repeatedly that he was "too old to be sitting by the door" and that "younger salesmen" should have that position—a sentiment that he reiterated the week before Willard was terminated. *Id.* at 141–42 (Page ID #133–34). After this comment from Malouf, Willard went to Schiller to report the harassing comments, but Schiller did not act—he told Willard to stop taking new customers. *Id.* at 143 (Page ID #134).

In February or March 2016, Schiller pressured Willard to put on a basketball jersey that was too small and took a picture of him in it. *Id.* at 147 (Page ID #135). Afterwards, Schiller showed the picture to their co-workers, laughing and stating, "look how old and fat Willie is." *Id.* at 148 (Page ID #135). Later, Willard learned that his picture was to serve as a model for a caricature of a collegiate basketball player in an advertisement for Huntington Ford. *Id.* at 147 (Page ID #135).

In his more than ten years at Huntington Ford, Willard was formally disciplined two times, prior to the events at issue here. On February 3, 2011, Willard received a written reprimand, an Employee Warning Notice, for cursing at Calhoun on the showroom floor. Sealed Ex. C, Employee Warning Notice Feb. 3, 2011. He was sent home early and returned to work the next day. *Id.*; R. 16-2 (Willard Dep. at 91) (Page ID #121). A year and a half later, on August 7, 2012, Willard received an Employee Warning Notice for signing a customer's signature on a form, resulting in his suspension for the rest of the work day as well as the next work day. Sealed Ex. D, Employee Warning Notice Aug. 7, 2012. The form was discovered, and the customer was invited back to the dealership to fill out the form. R. 16-11 (Schiller Dep. at 64) (Page ID #241). Willard returned to work the day after the suspension period ended. R. 16-2 (Willard Dep. at 95) (Page ID #122). Willard disputes that these disciplinary actions "were justified." Reply Br. at 12.

It is unclear if a third incident resulted in formal discipline. In October 2014, Kim Duley, a support staff member responsible for arranging automobile trades between Huntington Ford

and other dealerships, went to the President of Huntington Ford, Patrick Scoggin, and told him that she felt threatened by Willard. R. 16-6 (Scoggin Dep. at 30–34) (Page ID #151–52); R. 16-9 (Sheriff Case Report at 7) (Page ID #219). Scoggin characterized Duley's account of Willard's conduct as "verbal intimidation." R. 16-6 (Scoggin Dep. at 32) (Page ID #151). Scoggin and Schiller had "a coaching moment [with Willard] as opposed to a disciplinary moment" about his interactions with support staff. *Id.* at 31 (Page ID #151). But Scoggin described this incident as a "verbal warning" in his personal notes documenting these events. R. 16-9 (Sheriff Case Report at 7) (Page ID #219).[4] There is no Employee Warning Notice for this incident. Duley had a history of delaying the filing of Willard's paperwork because of interpersonal acrimony between them, and Willard regularly complained. R. 16-2 (Willard Dep. at 99–100) (Page ID #123).

Willard's final discipline came in December 2016, which resulted in his suspension and later termination. Willard and Duley clashed on Wednesday, December 21, 2016. *See* R. 16-9 (Sheriff Case Report at 5) (Page ID #217). When one of Duley's trades for Willard's customer fell through, he passive aggressively told Duley, "nice job on the dealer trade." R. 16-2 (Willard Dep. at 108) (Page ID #125). It is undisputed that Duley lost her temper then—Schiller described the altercation, writing that after hearing a "commotion" outside of his office, "Kim Duley was backing Dennis Willard into my office and both were having a heated argument. At this moment Kim was very much the aggressor." *Id.* at 10 (Page #222). Schiller also wrote that Duley escalated the situation. *Id.* ("I felt [Duley] very much added fuel to the fire by getting in his face with her responses."). Willard testified that Duley "came running [down the] entire length of the showroom floor and pushed me right outside of Brad Schiller's office," despite Willard's protestations to Duley to "take your hands off me." R. 16-2 (Willard Dep. at 106) (Page ID #125). She also "shoved" him when he was "standing . . . in a defensive posture." *Id.* at 122 (Page ID #129). It is disputed, however, whether Willard "behaved appropriately" that day, including whether he yelled at Duley. Reply Br. at 10–11; *see* R. 16-9 (Sheriff Case Report at 5–6) (Page ID #217–18); R. 16-6 (Scoggin Dep. at 51) (Page ID #156); R. 16-11 (Schiller Dep. at 81, 91–92) (Page ID #246, 248).

---

[4]The word "coaching" is used inconsistently in the record. "Coaching" may refer to an informal and/or verbal disciplinary action, but it is also used to mean encouraging and guiding salespersons as they go about their work. *See, e.g.,* R. 16-7 (Malouf Dep. at 37–38) (Page ID #183).

After the incident, several meetings occurred. First, Duley went to Scoggin to complain about Willard. R. 16-6 (Scoggin Dep. at 39) (Page ID #153). She informed him that Willard "got in her face" and that she would call the police. *Id.*[5] Then, Duley and Scoggin met with Schiller. *Id.* at 44 (Page ID #154). Schiller told Duley that her behavior was inappropriate. R. 16-11 (Schiller Dep. at 81) (Page ID #246). At the end of the meeting, Duley resigned. R. 16-6 (Scoggin Dep. at 44) (Page ID #154). Meanwhile, Willard went to Malouf to complain about Duley's performance. R. 16-7 (Malouf Dep. at 57–59) (Page ID #188). During this meeting, Willard intended to put a deal jacket on Malouf's desk, but missed the desk and picked up the papers from the floor. R.16-2 (Willard Dep. at 109–10) (Page ID #125–26).

Then, Scoggin, Schiller, Calhoun, and Malouf met to discuss Willard's involvement in the incident. R. 16-6 (Scoggin Dep. at 57–58) (Page ID #158). Calhoun and Malouf were asked to document what they had witnessed. R. 16-8 (Calhoun Dep. at 8) (Page ID #196); R. 16-7 (Malouf Dep. at 56–57) (Page ID #187–88). Scoggin and Schiller decided to suspend Willard. R. 16-6 (Scoggin Dep. at 54–55) (Page ID #157). Schiller wrote the corresponding Employee Warning Notice. *Id.* at 57–58 (Page ID #158); *see* Sealed Ex. K, Employee Warning Notice Dec. 21, 2016.

Next, Willard met with Schiller and Scoggin. R. 16-6 (Scoggin Dep. at 53) (Page ID #157). Schiller told Willard that he was suspended for a week for aggressive behavior. *See* R. 16-2 (Willard Dep. at 124) (Page ID #129). When Schiller presented Willard with a copy of the Employee Warning Notice, Willard saw that it did not state the length of his suspension or his return date. *Id.* Willard refused to sign the Notice because it was incomplete and he disagreed with the characterization of the events, and so Schiller refused to give him a copy of the Notice. *Id.* at 124–25, 127 (Page ID #129–30). Scoggin and Schiller then escorted Willard to his desk. R. 16-6 (Scoggin Dep. at 67) (Page ID #160). During this time, Willard called Scoggin a "poor excuse of a human being." *Id.* at 70 (Page ID #161).

---

[5]Duley did call the police. *See* R. 16-9 (Sheriff Case Report at 1) (Page ID #214). The police took no action in response to Duley's claims that Willard was intimidating her and came within two inches of her face or Willard's claims that Duley assaulted him. *See id.* at 5 (Page ID #218).

A full week later, on Wednesday, December 28, 2016, Willard returned to Huntington Ford. R. 16-2 (Willard Dep. at 132) (Page ID #131). Upon his arrival, Willard met with Scoggin and Schiller, who informed him that he had been terminated because he did not call in or show up for work on Monday, December 26, 2016, or Tuesday, December 27, 2016. *Id.* at 133 (Page ID #131); R. 16-6 (Scoggin Dep. at 87) (Page ID #165). They told him that they were also firing him because of his argument with Duley the week before and his ongoing issues with coworkers. R. 16-11 (Schiller Dep. at 105) (Page ID #252). Scoggin and Schiller made the decision to terminate Willard that Tuesday, the day after Huntington Ford asserts that Willard was scheduled to return to work. *Id.* at 100–01 (Page ID #250–51).

After his termination, Willard's desk sat empty for a few weeks. *See id.* at 76–77 (Page ID #244–45). Bob Brani, another salesperson, was moved to his desk. *Id.* at 77 (Page ID #245). Brani was fifty-six at the time. *See* R. 19-4 (Jan. 2018 Employee Census at 2) (Page ID #448). And about a month after Willard was terminated, Huntington Ford hired a man named Scott Dewitt, who was fifty-two at the time, as a new-car salesperson. *See id.* at 3 (Page ID #449).

Willard filed suit, alleging that Huntington Ford seized upon the incident with Duley and misled him about the length of his suspension so that it could terminate him because of his age. R. 1 (Compl. at 3–6) (Page ID #3–6). He brought two claims of age discrimination, one under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634, and one under Michigan's Elliott-Larsen Civil Rights Act of 1976 ("ELCRA"), MICH. COMP. LAWS §§ 37.2101–2804. *Id.* at 6–8 (Page ID #6–8).[6] Huntington Ford filed a motion for summary judgment on both claims. R. 16 (Mot. for Summary J. at 1–3) (Page ID #62–64). The district court held a hearing on June 25, 2019. R. 24 (Hr'g Tr. at 1) (Page ID #463). Because no written opinion followed, we provide the relevant portion of the transcript where the district court ruled from the bench:

> The Court: Okay. Well, I think we are all starting with the same standards. The law is the same in terms of direct evidence and circumstantial evidence. And I think I made it -- I haven't made it clear, but from my questions -- well, first of

---

[6]Willard administratively exhausted his claims with the Equal Employment Opportunity Commission. R. 16-14 (EEOC Dismissal and Notice of Rights at 1–2) (Page ID #258–59).

all, do you both agree that -- on the law? That if it's direct evidence you go down one path? If it's circumstantial you go down a different path?

[Plaintiff's Counsel]: Yes, your Honor.

[Defense Counsel]: Yes, your Honor.

The Court: And there are various steps. We also agree that I have to look at the evidence most favorable and taken most favorably to the plaintiff. And I don't think there is any direct evidence of age discrimination. I think the examples that you cite do not amount to [a] hostile work environment and, wisely, you didn't raise that as a claim.

In terms of circumstantial evidence, based on the record, I just don't think that the plaintiff has rebutted or answered the reason that defense has given as a legitimate reason. The combination of the conduct and the argument with another long term employee and, most importantly, his failure to appear at the end of the suspension. The fact that he is now saying that he willfully maintained his ignorance by not signing the paper doesn't help him and certainly would not help him in front of a jury in convincing [the jurors] that he should prevail. And, therefore, the Defendant's motion is granted.

*Id.* at 24–25 (Page ID #486–87). The district court entered an order granting the motion "[f]or the reasons stated on the record" and a judgment. R. 22 (Order) (Page ID #461); R. 23 (J.) (Page ID #462). This timely appeal followed. *See* R. 25 (Notice of Appeal) (Page ID #489).

## II. STANDARD OF REVIEW

We review de novo a district court's decision to grant a motion for summary judgment. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) (citing cases). We will affirm the district court's decision if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). First, the moving party must show that there are no genuine issues of material fact and that it is legally entitled to judgment. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Then, the nonmoving party must "present sufficient evidence to permit a reasonable jury to find in its favor." *Pierson v. QUAD/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Our ultimate question is "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving] plaintiff is entitled to a verdict." *Anderson*, 477 U.S. at 252. We must view all of the facts in the light most favorable to the nonmoving party and draw

all justifiable inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255.

## III. AGE-DISCRIMINATION CLAIMS

At the outset, we note how much more difficult our review is without a written opinion explaining the district court's decision. This is especially troubling on a motion for summary judgment, which is inherently fact-intensive. And when, as here, the nonmoving plaintiff has "proffered evidence in support of its position and the district court yet awards summary judgment against the non-moving party, our review of the district court's conclusion that no genuine issue of material fact remains is difficult, if not impossible, without a clear, written explanation by the district court judge." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996). District courts should endeavor to prepare written opinions because "[t]his reviewing court, and more importantly, the parties, are much better served when . . . the district court prepares a written opinion explaining its ruling and the reasoning, factual and legal, in support, especially when the ruling disposes of the case in a final judgment." *Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 617 (6th Cir. 2001). Nevertheless, we have done our due diligence and carefully studied the hearing transcript and the record.

### A. ADEA Claim

Pursuant to the ADEA, employers may not terminate an individual "because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may present either direct or indirect evidence to prove an ADEA violation. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (citing *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008)). No matter the type of evidence presented, the plaintiff retains the burden of persuasion to demonstrate "by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009) (footnote omitted) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141–43, 147

No. 19-1763        *Willard v. Huntington Ford, Inc.*        Page 10

(2000)). On appeal, Willard purports to offer both direct and indirect evidence that Huntington Ford terminated him because of his age. Appellant Br. at 17, 21.

Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)), *overruled on other grounds by Gross*, 557 U.S. at 180. Such evidence "requires the conclusion that age was the 'but for' cause of the employment decision." *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 530 (6th Cir. 2014) (clarifying the inquiry post-*Gross*).[7] In other words, direct evidence must "include[ ] both a predisposition to discriminate and that the employer acted on that predisposition." *Id.* (citing *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004), *overruled on other grounds by Gross*, 557 U.S. at 180). Willard argues that comments from Schiller, Calhoun, and Malouf are direct evidence of age discrimination. These statements, a medley of ageist slurs and putdowns tied to Willard's position at Huntington Ford, arguably constitute direct evidence, but we need not decide this issue because the comments are compelling circumstantial evidence that Huntington Ford's legitimate reasons for terminating Willard are pretextual. *See infra* Section III.A.3.

Indirect or circumstantial evidence "allow[s] a factfinder to draw a reasonable inference that discrimination occurred." *Geiger*, 579 F.3d at 620 (quoting *Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003)). ADEA claims relying on indirect evidence of age discrimination are analyzed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework. *Pierson*, 749 F.3d at 536 (citing *McDonnell Douglas*, 411 U.S. at 802–05). First, the plaintiff must produce "evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination" before the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Blair*, 505 F.3d at 524 (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). Then, the plaintiff must rebut the proffered reason by producing "evidence from a

---

[7]Huntington Ford argues that Willard fails to establish a prima facie case using direct evidence, Appellee Br. at 15, but *Gross* eliminated the burden-of-persuasion-shifting framework for direct evidence cases under the ADEA, *Geiger*, 579 F.3d at 621.

No. 19-1763                    *Willard v. Huntington Ford, Inc.*                    Page 11

which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.* (citing *Monette*, 90 F.3d at 1186); *see Provenzano*, 663 F.3d at 812 (citing *McDonnell Douglas*, 411 U.S. at 802).

As we have clarified before, the *McDonnell Douglas* burden-shifting framework allocates "the burden of *production* and [provides] an order for the presentation of proof in [employment discrimination] cases." *Provenzano*, 663 F.3d at 812 (last alteration in original) (emphasis added) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 659 (6th Cir. 2000)). Thus, at the first stage of the burden-shifting framework, we do not ask whether a jury could conclude that the plaintiff has proven its prima facie case by preponderant evidence, but rather whether "a reasonable jury could conclude that a prima facie case of discrimination has been established." *Provenzano*, 663 F.3d at 812 (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007)). At the pretext stage, the plaintiff's burden of production "merges" with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination. *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)); *see Blair*, 505 F.3d at 524 (noting that although the burdens of production shift between the parties, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff" (alteration in original) (quoting *Burdine*, 450 U.S. at 253)).

On appeal, Huntington Ford characterizes the district court's ruling as one that Willard "could not establish a prima facie case," Appellee Br. at 15–16, even though the district court rested its conclusion on Willard's purported failure to demonstrate pretext, *see* R. 24 (Hr'g Tr. at 25) (Page ID #487) ("I just don't think that the plaintiff has rebutted or answered the reason that defense has given as a legitimate reason."). In any event, we analyze each of the three stages of the burden-shifting framework for claims based on indirect evidence, and we conclude that Willard has shown a genuine issue of material fact as to whether he was intentionally discriminated against because of his age.

No. 19-1763                    *Willard v. Huntington Ford, Inc.*                    Page 12

### 1. Prima Facie Case

A plaintiff establishes his prima facie case by showing that (1) he is a member of a protected group, (2) he was qualified for the position in question, (3) his employer took an adverse employment action against him, and (4) there are "circumstances that support an inference of discrimination." *Blizzard*, 698 F.3d at 283 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). Relevant here, such circumstances include when the employer replaced the plaintiff with a younger employee and when the employer "treated similarly situated, non-protected employees more favorably." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521–22 (6th Cir. 2008) (citing *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007)). Willard was a member of a protected group because he was over the age of forty, *id.* at 521; he was qualified for the position of new-car salesperson; and his termination was an adverse employment action, and so only the fourth factor is disputed. *See* Appellant Br. at 23; Appellee Br. at 30.

The plaintiff's burden to establish a prima facie case is light, one "easily met" and "not onerous." *Provenzano*, 663 F.3d at 813 (quoting *Cline*, 206 F.3d at 660). The sole function of the prima facie stage of the burden-shifting framework is "to raise a rebuttable presumption of discrimination by 'eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff],'" such as the plaintiff is unqualified for the position or not a member of the protected group. *Cline*, 206 F.3d at 660 (alterations in original) (quoting *Hollins v. Atl. Co.*, 188 F.3d 652, 659 (6th Cir. 1999)). It is "not meant to stymie plaintiffs." *Id.* (citing *Burdine*, 450 U.S. at 253). We conclude that Willard has presented evidence to establish the fourth factor of his prima facie case because he points to evidence that Huntington Ford replaced him with a younger new-car salesperson after he was discharged and that younger salespersons were treated better.

First, Willard has offered enough evidence to permit a reasonable jury to conclude that he was replaced by a younger salesperson—Dewitt. Willard was a new-car salesperson. Sealed Ex. N, Jan. 2016 Employee Census at 1. Between January 2016 and January 2018, two new-car

No. 19-1763          *Willard v. Huntington Ford, Inc.*          Page 13

salespersons ceased working for Huntington Ford: Willard and Louis Sock,[8] and three new-car salespersons were hired: Dewitt, John Sawson, and Steven Rowe. *Compare id.* at 1–3 *with* R. 19-4 (Jan. 2018 Employee Census at 1–3) (Page ID #447–49). Sawson was hired on February 15, 2016; Rowe, on November 15, 2016; and Dewitt, on February 1, 2017. R. 19-4 (Jan. 2018 Employee Census at 1–3) (Page ID #447–49). To raise an inference of discrimination, Willard need only point to employees who are significantly younger than he is. *Blizzard*, 698 F.3d at 284 (citing *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003)) (stating that an age difference of ten or more years is significant whereas a difference of less than six years is not). All three newly hired new-car salespersons were at least ten years younger than Willard. *See* R. 19-4 (Jan. 2018 Employee Census at 1–3) (Page ID #447–49) (noting Dewitt was born in 1965, Sawson, in 1981, and Rowe, in 1972). In the light most favorable to Willard, the evidence shows that Sawson and Rowe were hired to replace Sock and as an additional, thirteenth new-car salesperson, and that Willard was replaced by Dewitt in February 2017.

Huntington Ford argues that Willard has not provided "documentary support" that Dewitt replaced Willard, that Willard took much of his customer base with him and so Dewitt could not have replaced Willard, and that Dewitt was hired too long after Willard's discharge to be Willard's replacement. Appellee Br. at 30–31. None of these arguments prevail. As discussed above, Willard provides documentary support that Dewitt replaced him, the Employee Censuses.

And the relevant inquiry is whether Dewitt was hired to assume Willard's responsibilities, an inquiry which in this case is not coextensive with whether they had the same customer base. *Blizzard*, 698 F.3d at 284 ("[A] 'person is replaced only when another employee is hired . . . to perform the plaintiff's duties.'" (quoting *Grosjean*, 349 F.3d at 336)). Maintaining a customer base is part of a new-car salesperson's responsibilities, as is selling cars to customers who walk through the door, examining vehicles, appraising vehicles, and reaching out to potential new customers. *See* R. 16-11 (Schiller Dep. at 16, 73–74) (Page ID #229, 244). As Schiller put it, the "[e]nd result is to sell a vehicle." *Id.* at 57 (Page ID #240). Additionally, Calhoun's testimony that even if a salesperson considers a customer as "their customer," "it's a

---

[8]We do not know exactly when Sock stopped working for Huntington Ford.

Huntington Ford customer" shows that Huntington Ford does not define new-car salesperson responsibilities by a customer portfolio. R. 16-8 (Calhoun Dep. at 70–71) (Page ID #212). There is nothing in the record that suggests that Huntington Ford defines new-car salespersons' responsibilities by their customer base.[9] By all accounts, it appears that all new-car salespersons had the same responsibilities. Huntington Ford provides no record citation to the contrary.

As to its last argument, Huntington Ford offers no legal support for its contention that a month is too long of a gap between Willard's termination and Dewitt's hiring to indicate that Willard was replaced by Dewitt. In *Blizzard*, we concluded that the employer replaced the plaintiff who was fired in April 2008 with a person who was hired on a part-time basis in November 2008 and on a full-time basis in July 2009. 698 F.3d at 282, 284 ("This conclusion is not undermined by the fact that there was a lapse in time between Blizzard's termination date and Teeter's hiring date."). Given the time to post a job description, interview candidates, and make a selection, a month is a short amount of time. If a month is too much time by Huntington Ford's account, what is not?

Second, Willard has shown that he was treated less favorably than younger employees by Calhoun. Calhoun would process his paperwork more slowly than that of the younger salespersons, which would have negatively impacted Willard's ability to finalize sales. Calhoun's conduct is uncontroverted. And although we typically compare a plaintiff to specific non-protected employees to determine whether the other employee is similarly situated in all relevant respects, *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998), the only relevant respect here appears to be the position of new-car salesperson because all new-car salespersons had paperwork that Calhoun must process to complete their sales. R. 16-2 (Willard Dep. at 88–89) (Page ID #120) (stating that deals could not be finalized without "the manager's" signature and then referencing Calhoun). Therefore, it is not necessary for Willard to point to a particular comparator. Calhoun's preferential treatment "support[s] an

---

[9]In some cases, it may make sense to define the responsibilities of a person in sales by their accounts, *see Blair*, 505 F.3d at 522 (discussing a salesperson's responsibilities as maintaining particular "accounts"), but in others, it may not. Huntington Ford is free to proceed with this argument at trial.

inference of discrimination" based on age at the prima facie stage. *Blizzard*, 698 F.3d at 283 (quoting *Swierkiewicz*, 534 U.S. at 510).

For these reasons, we conclude that Willard has produced sufficient record evidence such that a reasonable jury could conclude that he has met his prima facie burden.

### 2. Legitimate, Non-Discriminatory Reason

Next, the burden shifts to Huntington Ford to offer legitimate, non-discriminatory reasons for Willard's termination. Huntington Ford offers three. First, Willard did not show up for work on Monday, December 26, 2016, and Tuesday, December 27, 2016, or call to explain his absences. Second, Willard's behavior on December 21, 2016 with Duley was sufficient alone to justify his termination. And third, Willard had previous written and verbal disciplinary warnings. *See* Appellee Br. at 32. Huntington Ford has satisfied its burden.

### 3. Pretext

At this stage, Willard must demonstrate pretext and that he can meet his burden of persuasion. "An employee may show that an employer's proffered reason for terminating him was pretext by demonstrating 'that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Pierson*, 749 F.3d at 539 (quoting *Wexler*, 317 F.3d at 576). At this stage of the *McDonnell Douglas* burden-shifting framework, we examine all evidence that the plaintiff has put forth—evidence from the prima facie stage, "evidence discrediting the defendant's proffered reason," and "any additional evidence the plaintiff chooses to put forth." *Blair*, 505 F.3d at 532. We "consider all evidence in the light most favorable to the plaintiff, including the evidence presented at the prima facie stage." *Provenzano*, 663 F.3d at 812 (citing *Peck v. Elyria Foundry Co.*, 347 F. App'x 139, 145 (6th Cir. 2009)). The plaintiff must "produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it fired [him]." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *Mickey*, 516 F.3d at 526). In order "to survive summary judgment, a plaintiff need only produce enough evidence to . . . rebut, but not disprove, the defendant's proffered rationale." *Blair*, 505 F.3d at 532. At this stage, the plaintiff must show that he can meet his burden of persuasion to

No. 19-1763          *Willard v. Huntington Ford, Inc.*          Page 16

demonstrate impermissible bias was the but-for cause of his discharge. *Provenzano*, 663 F.3d at 812 (explaining that a plaintiff's burden to demonstrate pretext "merges" with his ultimate burden of persuasion (quoting *Burdine*, 450 U.S. at 256)); *Pierson*, 749 F.3d at 536 (quoting *Gross*, 557 U.S. at 177). Courts should be cautious in granting, and affirming, summary judgment on discrimination claims when the plaintiff has made a prima facie case and a showing of pretext because "an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage." *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 564 (6th Cir. 2004) (citations omitted).

Willard argues that Huntington Ford's proffered reasons are pretextual. He points to evidence challenging each reason and then provides general circumstantial evidence of age discrimination, the ageist remarks and ageist incidents. Appellant Br. at 26–28. Considering all of the record evidence that Willard has produced and drawing reasonable inferences in his favor, a jury could reasonably reject Huntington Ford's proffered reasons for terminating him and could determine that his age was the but-for cause of his termination.

### a. Failure to Show up or Call in

Willard has pointed clearly to a genuine and material fact dispute regarding the length of his suspension, leading to his tardy appearance on Wednesday, December 28, 2016, which formed a basis for his termination. First, he argues that this justification had no basis in fact.[10] Viewing the facts in the light most favorable to Willard, he was told that he was suspended for a week, the Employee Warning Notice lacked a return date, he was not given an opportunity to sign a complete Notice, he did not receive a copy of a complete Notice, and he did not receive a copy of the Sheriff's Case Report, which noted his return date, until December 27, 2016, R. 16-2 (Willard Dep. at 114) (Page ID #127). The district court failed to view the facts in the light most favorable to Willard and instead judged Willard's credibility and concluded that Willard "willfully maintained his ignorance by not signing the paper." R. 24 (Hr'g Tr. at 25) (Page ID

---

[10]The three-part test for pretext "need not be applied rigidly," but rather "is a commonsense inquiry." *Blizzard*, 698 F.3d at 285. We consider Willard's argument as one that his termination had no basis in fact and one that it was not the actual motivation for his termination.

No. 19-1763        *Willard v. Huntington Ford, Inc.*        Page 17

#487). This was error, and it is magnified by the fact that this was the only one of Willard's pretext arguments that the district court considered explicitly in its brief ruling.

Despite its protestations that there is no factual dispute on this point, Huntington Ford notes that Willard's testimony that he was told to return to work after a full week had elapsed "is inconsistent with the December 21, 2016 Employee Warning Notice, which he refused to sign, and the Sheriff's report." Appellee Br. at 34–35. This inconsistency is precisely the point at summary judgment. To the extent that Huntington Ford invites us to make witness credibility determinations, believing the company over Willard, or to weigh the evidence, concluding that Willard's testimony is less persuasive than the Notice or three supervisors' testimonies, we decline to do so. A nonmoving plaintiff's opinion testimony is evidence, *see Blizzard*, 698 F.3d at 286, and it is for the jury to determine its relative truth and weight.

Second, Willard offers evidence regarding his return date that indicates his failure to show up was not the motivation behind his discharge. He testified that Scoggin and Schiller would not show him a Notice that contained the dates of his suspension, which is consistent with his theory that the return date of Monday, December 26, 2016, was manufactured by Huntington Ford. Additionally, it is undisputed that Willard had an "[e]xcellent" attendance record, R. 16-11 (Schiller Dep. at 108–09) (Page ID #252–53), and that he returned to work promptly after his previous two suspensions. This showing casts further doubt upon Huntington Ford's explanation that it terminated Willard in part for his failure to show up for work.

### b. Conduct on December 21, 2016

First, Willard argues that his suspension for the December 21, 2016 incident had no basis in fact. Appellant Br. at 25–26. Willard testified that he was not at fault for the incident with Duley, including that he never yelled, which is corroborated by his statement in the Sheriff's Case Report. He also testified that Huntington Ford seized upon this incident to fabricate a legitimate reason to terminate him. R. 16-2 (Willard Dep. at 107) (Page ID #125). Viewing the record in the light most favorable to Willard, Duley was at fault for the disagreement on December 21, 2016 and Willard did not actively participate in the disagreement. Rather, he told Duley to cease her physical contact with him and submitted to her pushing and shoving. It is

No. 19-1763 *Willard v. Huntington Ford, Inc.* Page 18

also disputed whether Willard simply missed Malouf's desk when he put down the deal jacket or whether he threw it on purpose to the floor. *See* R. 16-2 (Willard Dep. at 109–10) (Page ID #125–26); R. 16-7 (Malouf Dep. at 73) (Page ID #192).

Second, Willard argues that this incident with Duley did not actually motivate his discharge. Scoggin did not know whether Willard would have been fired on Monday or Tuesday if he had showed up for work. R. 16-6 (Scoggin Dep. at 79) (Page ID #163). This demonstrates that the incident on December 21, 2016, even if sufficient on its own to justify Willard's termination, was not the cause for his termination. This showing and Willard's previous showing regarding his absences together rebut Huntington Ford's two most prominent asserted legitimate reasons for Willard's discharge.[11]

### c. Previous Disciplinary Conduct

This leaves only Willard's previous disciplinary history, and he points to evidence demonstrating that his previous disciplines did not actually factor into the decision to terminate him. Willard's formal disciplinary history is temporally distant from his termination. It is undisputed that Willard's last formal discipline occurred nearly *four years* before, in 2012, his suspension and termination in 2016. *See Vincent v. Brewer Co.*, 514 F.3d 489, 499 (6th Cir. 2007) (concluding that a five- or six-week delay between the employer's adverse action and the last of the employee's "alleged instances of misconduct" was indicative of pretext in a Title VII case). And in the light most favorable to Willard, the 2014 discussion about Willard's interactions with support staff was not a formal discipline, but an informal coaching or conversation. Willard's formal disciplinary record is thin, considering that it covers more than a ten-year period. This evidence demonstrates that Huntington Ford's final legitimate, nondiscriminatory reason for terminating Willard was not the real motivation for the discharge.

---

[11]Huntington Ford invokes the honest-belief rule in passing in its appellate brief, arguing that Willard cannot show that his suspension for the December 21, 2016 incident and termination the following week lacked a basis in fact or that Willard's conduct was insufficient motivation to discharge Willard. Appellee Br. at 33, 36–37. Huntington Ford forfeited its honest-belief arguments because it did not present them to the district court. *Tuttle*, 474 F.3d at 319 n.11 (citing *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993)); *see also* R. 16 (Mot. for Summary J.); R. 20 (Reply).

Huntington Ford argues that Willard had ongoing issues with support staff, Appellee Br. at 7, 14, but it is undisputed that these instances did not result in formal discipline. Moreover, Willard testified that any of his interpersonal tiffs, including with Duley, were not beyond "normal activity." R. 16-2 (Willard Dep. at 111) (Page ID #126). Crucially, the record shows that a dealership is a high-anxiety, stressful place to be that at times results in friction among employees, leading to discussions with management. But there is nothing in the record that shows that Willard's interpersonal conduct rose to a disciplinary level, except what actually resulted in formal discipline.

### d. Other Circumstantial Evidence

Willard offers two types of circumstantial evidence showing that Huntington Ford's proffered reasons for terminating him were pretext for age discrimination. First, he points to the discriminatory comments, including those about his retirement, the ageist insults, Calhoun's statement that Willard was an "over-the-hill" salesman, Schiller's statement that Willard is "old and fat," and Malouf's comments that Willard was too old to sit at a front desk and a younger salesperson should sit there. Appellant Br. at 17–21. In *Ercegovich*, we considered the role of the speaker, the substance of the comments, and the nexus to the adverse employment action to determine the probative value of discriminatory statements at the pretext stage. 154 F.3d at 354–56. Under this framework, Willard offers comments that certainly have probative value and thus serve as additional evidence of pretext.

All of the statements were made by Willard's supervisors who participated in the decision to terminate him. It is undisputed that Schiller played a role in the termination decision, and there is a factual dispute whether Calhoun and Malouf participated as well. Scoggin testified that he and Schiller would have gotten "feedback from people that, you know, interacts [sic] with [Willard] on a regular basis" before terminating him. R. 16-6 (Scoggin Dep. at 83) (Page ID #164). He also stated that Calhoun and Malouf had "input" in the Employee Warning Notice that suspended Willard in December 2016, showing that direct supervisors usually had a role in adverse employment actions regarding their subordinates. *Id.* at 57–58 (Page ID #158).

Additionally, the substance of the statements evinces a strong bias against older workers and a desire to see Willard leave the dealership due to his age. Every statement, with the exception of those addressing Willard's retirement, is either an overtly negative comment about Willard's age or an ageist slur. The meaning of comments like "dinosaur," "grandpa," and "over-the-hill" is plain, as is Schiller's comment that Willard was "old and fat." Malouf's statements about Willard's desk go even further. The comments not only pointed to Willard's age, but also juxtaposed him with younger salespersons and suggested that Willard should take a less active role as a new-car salesperson, indicating a desire to squeeze Willard out of his position. As to the retirement comments, only a miniscule inference is required to conclude that the comments address Willard's age and express a wish that Willard no longer work at Huntington Ford.

Finally, these comments also bear a close connection, or nexus, to Willard's termination. Although Willard does not provide a date and time for each of Malouf's statements about Willard's desk, within a week of Malouf's last statement, Willard was terminated. This timing is suspicious and suggests that the same ageist bias behind Malouf's comments was the motivation behind Willard's termination. This conclusion is further buttressed by Schiller's response to Willard's complaints about Malouf's comments, that Willard should stop picking up new customers. And though Willard testified only that the other ageist insults and slurs were made on a regular basis, "[c]ircumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace . . . may serve as circumstantial evidence of individualized discrimination directed at the plaintiff." *Ercegovich*, 154 F.3d at 356. This is especially so when these discriminatory statements "reflect a cumulative managerial" bias. *Id.* These insults show that Schiller, Calhoun, and Malouf, all managers, "harbor[ed] a bias against older workers." *Id.* at 355. Viewed in the light most favorable to Willard, these comments demonstrate a discriminatory attitude toward Willard and a desire that Willard should leave Huntington Ford. At the least, only small inferences are required to conclude that the statements evinced a desire to see Willard leave the dealership *because of* his age. *See id.* ("[T]he absence of a direct nexus does not necessarily render a discriminatory remark irrelevant.").

Second, Willard points to four discriminatory incidents: Willard's replacement with Dewitt, Calhoun's preferential treatment of younger salespersons, the jersey incident, and Brani's assignment to Willard's desk after his termination. Dewitt's hiring and Calhoun's conduct form the basis of Willard's prima facie case, so we need not restate those details here. As for the other instances, each has been discussed once before, so we recount them only briefly. Huntington Ford does not dispute, nor can it based on the record, that the incident with the basketball jersey involving Schiller occurred, or that it culminated in Schiller taking Willard's picture in the jersey, mocking him with it, and using it as a model for a caricature of a young collegiate basketball player. It is also undisputed that Brani, a younger salesperson, was placed at Willard's desk after Willard was terminated within roughly a month of Malouf's statements about the desk. Along with the discriminatory statements, these incidents, taking Willard's evidence as true, demonstrate a discriminatory atmosphere based on age and that this bias was frequently directed at Willard by his supervisors.

\*

There are genuine issues of material fact regarding pretext that preclude summary judgment. Viewing the facts in the light most favorable to Willard, including evidence in support of his prima facie case, evidence offered to demonstrate pretext—some of which is uncontroverted—and other circumstantial evidence, a reasonable jury could conclude that Huntington Ford did not fire him for the proffered reasons and that Willard has met his burden of persuasion to demonstrate his age was the but-for cause of his termination. Pretext in this case reduces to two questions: first, which party should be believed—Willard or his employer; and second, which type of evidence is more believable—documents or testimony. Our resolution of these issues is straight-forward: We do not make credibility determinations, nor do we weigh the evidence. Accordingly, Willard has met his burden to defeat summary judgment on his ADEA claim.

## B. ELCRA Claim

Like the ADEA, the ELCRA prohibits employers from "discharg[ing] . . . an individual with respect to employment . . . because of . . . age." MICH. COMP. LAWS § 37.2202(a).

No. 19-1763　　　　　*Willard v. Huntington Ford, Inc.*　　　　　Page 22

Generally, we have analyzed age-discrimination claims under the ELCRA like ADEA claims. *See, e.g.*, *Blair*, 505 F.3d at 523 (citing cases). However, the parties dispute the appropriate causation standard. Willard argues that the proper standard for age-discrimination claims brought under the ELCRA is whether the defendant's discriminatory age bias was a "substantial" or "motivating" factor in the adverse employment decision. Appellant Br. at 14. Huntington Ford urges that the proper standard for causation is the ADEA's but-for standard from *Gross*. Appellee Br. at 19. We need not decide which standard to apply because we have concluded that Willard's claim meets the more demanding but-for standard.

## IV.  CONCLUSION

For these reasons, we **REVERSE** the judgment of the district court and **REMAND** for proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-1763

DENNIS J. WILLARD,

     Plaintiff - Appellant,

     v.

HUNTINGTON FORD, INC.,

     Defendant - Appellee.

> **FILED**
> Mar 11, 2020
> DEBORAH S. HUNT, Clerk

Before:  MOORE, KETHLEDGE, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk